AO 106 (Rev. 04/10) Application for a Search Warrant

FILED

AUG 2 0 2024

CLERK, U.S. DISTRICT COURT
NORFOLK, VA

# UNITED STATES DISTRICT COURT
for the
Eastern District of Virginia

In the Matter of the Search of
*(Briefly describe the property to be searched
or identify the person by name and address)*

IN THE MATTER OF THE SEARCH OF INFORMATION ASSOCIATED WITH X (FORMERLY TWITTER) ACCOUNT "@GOHAMTAZ29" THAT IS STORED AT PREMISES CONTROLLED BY X CORP.

)
)
)
)
)
)
)

UNDER SEAL

Case No. 4:24-SW-113

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

See Attachment A

located in the _____Northern_____ District of _____California_____, there is now concealed *(identify the person or describe the property to be seized):*

See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☐ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| Title 18 USC § 2251(a) | Production of Child Pornography |

The application is based on these facts:
See affidavit

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

REVIEWED AND APPROVED:

Peter Osyf
Assistant United States Attorney

_____
*Applicant's signature*

SA Desirae Maldonado, FBI
_____
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 8/20/24

_____
*Judge's signature*

City and state: Norfolk, Virginia

The Hon. Douglas E. Miller, U.S. Magistrate Judge
_____
*Printed name and title*

## ATTACHMENT A

## ITEM TO BE SEARCHED

This warrant applies to information associated with X (formerly Twitter) account "**@GOHAMTAZ29**" (the "**SUBJECT ACCOUNT**") (active on, but not limited to, between January 19, 2024, through present), that is stored at premises owned, maintained, controlled, or operated by X Corp. ("X"), an electronic communications service and/or remote computing service provider headquartered at 1355 Market Street, Suite 900, San Francisco, CA 94103.

**ATTACHMENT B**

**DESCRIPTION OF ITEMS TO BE SEIZED**

I.    **Information to be disclosed by X Corp.**

To the extent that the information described in Attachment A is within the possession, custody, or control of X Corp. (formerly Twitter), regardless of whether such information is located within or outside of the United States, and including any communications, records, files, logs, or information that has been deleted but is still available to X Corp. X Corp. is required to disclose to the government the following for the **SUBJECT ACCOUNT** listed in Attachment A:

A.  All business records and subscriber information, in any form kept, pertaining to the **SUBJECT ACCOUNT**, including:

1.  Identity and contact information (past and current), including full name, email address, physical address, date of birth, phone number, gender, and other personal identifiers;

2.  All usernames (past and current) and the date and time each username was active, all associated accounts (including those linked by machine cookie, IP address, email address, or any other account or device identifier), and all records or other information about connections with third-party websites and mobile apps (whether active, expired, or removed);

3.  Length of service (including start date), types of services utilized, purchases, and means and sources of payment (including any credit card or bank account number) and billing records;

4.  Devices used to login to or access the account, including all device identifiers, attributes, user agent strings, and information about networks and connections, cookies, operating systems, and apps and web browsers;

5.  All advertising information, including advertising IDs, ad activity, and ad topic preferences;

6.  Internet Protocol ("IP") addresses used to create, login, and use the account, including associated dates, times, and port numbers, from January 19, 2024, to present;

7.  Privacy and account settings, including change history; and

8.  Communications between X. Corp. and any person regarding the account, including contacts with support services and records of actions taken;

B. All content, records, and other information relating to communications sent from or received by the **SUBJECT ACCOUNT** from January 19, 2024, to present; including but not limited to:

1. The content of all Tweets created, drafted, favorited/liked, or retweeted by the account, and all associated multimedia, metadata, and logs;

2. The content of all direct messages sent from, received by, stored in draft form in, or otherwise associated with the account, including all attachments, multimedia, header information, metadata, and logs;

C. All other content, records, and other information relating to all other interactions between the **SUBJECT ACCOUNT** and other Twitter users January 19, 2024, to present, including but not limited to:

1. All users the account has followed, unfollowed, muted, unmuted, blocked, or unblocked, and all users who have followed, unfollowed, muted, unmuted, blocked, or unblocked the account;

2. All information from the "Connect" or "Notifications" tab for the account, including all lists of Twitter users who have favorited or retweeted tweets posted by the account, as well as all tweets that include the username associated with the account (i.e., "mentions" or "replies");

3. All contacts and related sync information; and

4. All associated logs and metadata;

D. All other content, records, and other information relating to the use of the **SUBJECT ACCOUNT**, including but not limited to:

1. All data and information associated with the profile page, including photographs, "bios," and profile backgrounds and themes;

2. All multimedia uploaded to, or otherwise associated with, the account;

3. All records of searches performed by the account from January 19, 2024, to present;

4. All location information, including all location data collected by any plugins, widgets, or the "Tweet With Location" service, from January 19, 2024, to present and

5. All information about the account's use of Twitter's link service, including all longer website links that were shortened by the service, all resulting shortened links, and all information about the number of times that a link

posted by the account was clicked.

X Corp. is hereby ordered to disclose the above information to the government within 14 days of issuance of this warrant.

**II.    Information to Be Seized by the Government**

A. All information described above in Section I that constitutes fruits, contraband, evidence, and instrumentalities of violations of Title 18, United States Code, Sections 2251(a), which prohibit the production of child pornography for the **SUBJECT ACCOUNT** listed on Attachment A, information pertaining to the following matters:

1. Production, transportation, receipt, distribution, and possession of child pornography, and contact with others to obtain sexually explicit material from minors.

2. Evidence indicating how and when the account was accessed or used, to determine the chronological and geographic context of account access, use, and events relating to the crime under investigation and to the account's owner.

3. Evidence indicating how and when the account was accessed or used, to determine the geographic and chronological context of account access, use, and events relating to the crime under investigation and to the account's owner.

4. The identity of the person(s) who created or used the account, including records that help reveal the whereabouts of such person(s).

5. The identity of the person(s) who communicated with the account about producing, transporting, receiving, distributing, and possessing child pornography, including records that help reveal their whereabouts.

FILED

AUG 2 0 2024

CLERK, U.S. DISTRICT COURT
NORFOLK, VA

**IN THE UNITED STATES DISTRICT COURT FOR
THE EASTERN DISTRICT OF VIRGINIA
Newport News Division**

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF INFORMATION ASSOCIATED WITH X (FORMERLY TWITTER) ACCOUNT "@GOHAMTAZ29" THAT IS STORED AT PREMISES CONTROLLED BY X CORP. | Case No. 4:24-SW-113<br><br>**Filed Under Seal** |

**AFFIDAVIT IN SUPPORT OF
AN APPLICATION FOR A SEARCH WARRANT**

**INTRODUCTION AND AGENT BACKGROUND**

I, Desirae Maldonado, being duly sworn, hereby depose and state:

1.      I am a Special Agent with the United States Department of Justice, Federal Bureau of Investigation (FBI). I have been employed by the FBI as a Special Agent since January 2019. As such, I am an "investigative or law enforcement officer" of the United States within the meaning of 18 U.S.C. § 2510(7), that is, I am an officer of the United States, who is empowered by law to conduct investigations regarding violations of United States law, to execute warrants issued under the authority of the United States, and to make arrests of the offenses enumerated in 18 U.S.C. §§ 2251 et. seq. In the course of my duties, I am responsible for investigating crimes which include, but are not limited to, child exploitation and child pornography. I have previously been involved in criminal investigations concerning violations of federal laws. Since joining the FBI, I have received specialized training in human trafficking investigations, identifying and seizing electronic evidence, computer forensics, recovery, and social media investigations.

2.      The information set forth in this affidavit is known to me as a result of an investigation personally conducted by me and other law enforcement agents. Thus, the statements in this affidavit are based in part on information provided to Special Agents ("SAs") and other employees of the FBI, as well as other investigators employed by federal or state governments. I have participated in investigations involving persons who collect and distribute child pornography, and the importation and distribution of materials relating to the sexual exploitation of children. I have received training in the areas of child exploitation, and I have reviewed images and videos of child pornography in a wide variety of media forms, including computer media. I have also discussed and reviewed these materials with other law enforcement officers.

3.      In the course of my employment as a sworn law enforcement officer, I have participated in the execution of numerous search warrants resulting in the seizure of computers,

1

magnetic storage media for computers, cellular devices, electronic media, and other items evidencing violations of state and federal laws.

## LOCATION

4. This affidavit is made in support of an application for a search warrant for:

    a. Information associated with the X Corp. X account "**@GOHAMTAZ29**" (the "**SUBJECT ACCOUNT**"), that are stored at premises owned, maintained, controlled, or operated by X Corp. ("X"), an electronic communications service and/or remote computing service provider headquartered at 1355 Market Street, Suite 900, San Francisco, CA 94103. The information to be searched is described in the following paragraphs and in Attachment A.

5. The information contained in this Affidavit is based upon my personal knowledge and observation, my training and experience, conversations with other law enforcement officers and witnesses, and the review of documents and records.

6. This affidavit is based upon information that I have gained from my investigation, my training and experience, and conversations with other law enforcement officers. Since this affidavit is being submitted for the limited purpose of securing a search warrant, I have not included each and every fact known to me concerning this investigation. I have set forth only the facts that I believe are necessary to establish probable cause to believe that evidence, fruits, and instrumentalities (described in Attachment B) of violations of 18 U.S.C. § 2251(a), are within the information associated with the account mentioned above.

7. The purpose of this application is to seize evidence, contraband, fruits, and other items related to violations of 18 U.S.C. § 2251(a) relating to material involving the sexual exploitation of minors (the "Specified Federal Offense").

8. This affidavit is made, in part, in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A) to require X to disclose to the Government records and other information in its possession, pertaining to the subscriber or customer associated with the accounts, including the contents of communications.

## LEGAL AUTHORITY

### A. Pertinent Criminal Statutes

9. This investigation concerns alleged violations of 18 U.S.C. § 2251(a) regarding to the production of child pornography.

2

10.   18 U.S.C. § 2251(a) provides that any person who employs, uses, persuades, induces, entices, or coerces, or attempts to do so, any minor to engage in, or who has a minor assist any other person to engage in, or who transports any minor in or affecting interstate or foreign commerce, or in any Territory or Possession of the United States, with the intent that such minor engage in, any sexually explicit conduct for the purpose of producing any visual depiction of such conduct or for the purpose of transmitting a live visual depiction of such conduct, shall be punished as provided under subsection (e), if such person knows or has reason to know that such visual depiction will be transported or transmitted using any means or facility of interstate or foreign commerce or in or affecting interstate or foreign commerce or mailed, if that visual depiction was produced or transmitted using materials that have been mailed, shipped, or transported in or affecting interstate or foreign commerce by any means, including by computer, or if such visual depiction has actually been transported or transmitted using any means or facility of interstate or foreign commerce or in or affecting interstate or foreign commerce or mailed.

## B.   Other Legal Authority

11.   The legal authority for this search warrant application regarding the X Corp. **SUBJECT ACCOUNT** is derived from 18 U.S.C. §§ 2701-2711, entitled "Stored Wire and Electronic Communications and Transactional Records Access." Section 2703(a) provides in relevant part as follows:

> A governmental entity may require the disclosure by a provider of electronic communication service of the contents of an electronic communication that is in electronic storage in an electronic communications system for one hundred and eighty days or less, only pursuant to a warrant issued under the Federal Rules of Criminal Procedure or equivalent State warrant. A governmental entity may require the disclosure by a provider of electronic communications services of the contents of an electronic communication that has been in electronic storage in an electronic communications system for more than one hundred and eighty days by the means available under subsection (b) of this section.

12.   18 U.S.C. § 2703(b) provides in relevant part as follows:

> (1) A governmental entity may require a provider of remote computing service to disclose the contents of any electronic communication to which this paragraph is made applicable by paragraph (2) of this subsection –
>
> > (A) without required notice to the subscriber or customer, if the governmental entity obtains a warrant issued under the Federal Rules of Criminal Procedure or equivalent State warrant.

3

(2) Paragraph (1) is applicable with respect to any electronic communication that is held or maintained on that service –

>   (A) On behalf of, and received by means of electronic transmission from (or created by means of computer processing of communications received by means of electronic transmission from), a subscriber or customer of such remote computing service; and

>   (B) Solely for the purpose of providing storage or computer processing services to such subscriber or customer, if the provider is not authorized to access the contents of any such communications for purposes of providing any services other than storage or computer processing.

13.    The government may also obtain records relating to e-mail communications, such as subscriber identifying information, by way of a search warrant. 18 U.S.C. § 2703(c)(1)(A).

14.    This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711(3), 18 U.S.C. §§ 2703(a), (b)(1)(A) & (c)(1)(A). Specifically, the Court is "a district court of the United States . . . that – has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i). Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant. X Corp. accepts out-of-state and out-of-district service of subpoenas, court orders, and search warrants by fax without the presence of a law enforcement officer. Accordingly, your affiant will execute the requested search warrant by facsimile to the custodian of records at X Corp. and permission is requested for the data to be copied / obtained outside of the presence of a law enforcement officer. It is anticipated that X Corp. will produce the requested records in electronic format accompanied by a signed authentication letter via E-mail or on electronic media via U.S. Mail to your affiant.

15.    This investigation involves offenses within the jurisdiction and proper venue of the United States District Court for the Eastern District of Virginia, as more fully articulated below. *See* 18 U.S.C. § 3237(a); see also 18 U.S.C. §§ 3231 and 3232. *See United States v. Bagnell,* 679 F.2d 826, 830 (11th Cir. 1982) (venue is proper in child pornography and obscenity prosecution in district where images were either distributed or received).

## DEFINITIONS

16.    The terms "records," "documents," and "materials" include all information recorded in any form, including the originals and all non-identical copies thereof, whether different

4

from the original by reason of any notation made on such copies or otherwise, including, but not limited to the following:

    a. graphic records or representations;
    b. photographs;
    c. pictures;
    d. images, and
    e. aural records or representations.

17. The terms "records," "documents," and "materials" include all of the foregoing, in whatever form and by whatever means, the records, documents, or materials, and their drafts, or their modifications may have been created or stored, including (but not limited to): any electrical, electronic, or magnetic form (including but not limited to any information on an electronic or magnetic storage device such as hard disks).

18. The terms "minor" and "sexually explicit conduct" are defined in 18 U.S.C. §§ 2256(1) and (2). A "minor" is defined as "any person under the age of eighteen years." The term "sexually explicit conduct" means actual or simulated:

    a. Sexual intercourse, including genital-genital, oral-genital, anal-genital, or oral-anal, whether between persons of the same or opposite sex;
    b. Bestiality;
    c. Masturbation;
    d. Sadistic or masochistic abuse; or
    e. Lascivious exhibition of the genitals or pubic area of any person.

19. The term "computer" as used herein is defined pursuant to 18 U.S.C. § 1030(e)(1), as "an electronic, magnetic, optical, electrochemical, or other high speed data processing device performing logical or storage functions, and includes any data storage facility or communications facility directly related to or operating in conjunction with such device."

20. The term "Universal Resource Locator" (URL): A URL is the unique address for a file that is accessible on the Internet. For example, a common way to get to a website is to enter the URL of the website's home page file in the Web browser's address line. Additionally, any file within that website can be specified with a URL. The URL contains the name of the protocol to be used to access the file resource, a domain name that identifies the specific computer on the Internet, and a pathname, a hierarchical description that specifies the location of a file in that computer.

21. The term "Internet Protocol Address" (IP Address): This term refers to the fact that every computer or device on the Internet is referenced by a unique Internet Protocol address the same way every telephone has a unique telephone number. An example of an IP address is 192.168.10.102. Each time an individual accesses the Internet, the computer from which that individual initiates access is assigned an IP address. There are two types of  IP addresses: static

5

and dynamic. A static address is permanent and never changes, such as ones used in cable modems. The dynamic address changes almost every time the     computer connects to the Internet.

22.    The term "Internet Service Provider" (ISPs): This term refers to individuals who have an Internet account and an Internet-based electronic mail (e-mail) address must have a subscription, membership, or affiliation with an organization or commercial service which provides access to the Internet. A provider of Internet access and services is referred to as an Internet Service Provider or "ISP."

23.    "Web hosts" provide the equipment and services required to host and maintain files for one or more websites and to provide rapid Internet connections to those websites. Most hosting is "shared," which means that multiple websites of unrelated companies are on the same server in order to reduce associated costs. When a client develops a Website, the client needs a server and perhaps a web hosting company to host it. "Dedicated hosting," means that the web hosting company provides all of the equipment and assumes all of the responsibility for technical support and maintenance of a website. "Co location" means a server is located at a dedicated hosting facility designed with special resources, such as a secure cage, regulated power, a dedicated Internet connection, online security and online technical support. Co location facilities offer customers a secure place to physically house the customers' hardware and equipment as opposed to keeping it in their offices or warehouse, where the potential for fire, theft or vandalism is greater.

24.    "Electronic Communication Service" refers to any service which provides to users thereof the ability to send or receive wire or electronic communications. 18 U.S.C. § 2510(15).

25.    "Remote Computing Service" is a service that provides to the public computer storage or processing services by means of an "electronic communications system." 18 U.S.C. § 2711.

26.    "Electronic Communications System" means any wire, radio, electromagnetic, photo-optical, or photo-electronic facilities for the transmission of wire or electronic communications, and any computer facilities or related electronic equipment for the electronic storage of such communications. 18 U.S.C. § 2510(14).

27.    "Contents," when used with respect to any wire, oral, or electronic communication, includes any information concerning the substance, purport, or meaning of that communication. 18 U.S.C. § 2510(8).

28.    "Electronic storage" means (a) any temporary, intermediate storage of a wire or electronic communication incidental to the electronic transmission thereof; and (b) any storage of such communication by an electronic communication service for purposes of backup protection of such communication. 18 U.S.C. § 2510(17).

6

29.    "Child Erotica," as used herein, means materials or items that are sexually arousing to persons having a sexual interest in minors but that are not, in and of themselves, obscene or that do not necessarily depict minors in sexually explicit poses or positions.

30.    "Child Pornography," as used herein, includes the definition in 18 U.S.C. § 2256(8) (any visual depiction of sexually explicit conduct where (a) the production of the visual depiction involved the use of a minor engaged in sexually explicit conduct, (b) the visual depiction is a digital image, computer image, or computer-generated image that is, or is indistinguishable from, that of a minor engaged in sexually explicit conduct, or (c) the visual depiction has been created, adapted, or modified to appear that an identifiable minor is engaged in sexually explicit conduct), as well as any visual depiction, the production of which involves the use of a minor engaged in sexually explicit conduct. 18 U.S.C. §§ 2252 and 2256(2).

31.    "Spam" email refers to unsolicited (usually commercial) electronic mail messages sent in bulk to recipients.

32.    Cloud Computing is a model for enabling ubiquitous, convenient, on-demand network access to a shared pool of configurable computing resources that do not require end-user knowledge of the physical location and configuration of the system that delivers the services (e.g. Instead of storing files on your home computer, an alternate storage location could be a file storage service provider somewhere connected to the Internet, sometimes referred to as the "Cloud").

33.    Cloud Storage is a network of online storage where data is saved in virtual storage that is hosted by third parties.  The hosting companies operate large data centers, possibly across multiple servers.  Cloud storage allows users to save files and data online and access their information from anywhere using any computer that is connected to the Internet.

## BACKGROUND CONCERNING X (FORMERLY TWITTER)

34.    X Corp. owns and operates X (formerly Twitter), a social networking and microblogging service that can be accessed at http://www.x.com, which redirects to http://www.twitter.com, and via the X (formerly Twitter) mobile application ("app"). Generally, X allows users to register and create an account; to personalize (if desired) an account profile page; and to send and receive communications via the platform. These functionalities are discussed in more detail below.

35.    X permits its users to communicate via messages that can contain photos, videos, links, and/or a maximum of 280 characters of text. Users can choose to share these messages, called "Tweets," with the public or, alternatively, to "protect" their Tweets by making them viewable by only a preapproved list of "followers." Each Tweet includes a timestamp that displays when the Tweet was posted to X. Users can also Tweet a copy of other Tweets ("retweet") or Tweet a reply to another Tweet. Users can also indicate that they like a Tweet by clicking on a heart icon that appears next to each Tweet on the platform.

7

36.    X also permits its users to exchange private messages, known as "direct messages" or "DMs," with other X users. DMs, which also may include photos, videos, links, and/or text, can only be viewed by the sender and designated recipient(s). Direct messages may be sent to an individual user or to a group of up to 50 X users. X users have the ability to choose whether they can receive a direct message from anyone. At any time, a X user has the ability to alter the settings on their X account so that they can receive direct messages only from (1) individuals to whom the user has already sent a direct message and (2) X accounts that the user "follows" via his account.

37.    While individuals are not required to register with X to view the content of unprotected Tweets, individuals must register for a X account to send Tweets, to "follow" accounts in order to view protected Tweets, and to send and receive direct messages. A user may register for an account for free by visiting X's website or via the X app. When a user creates a new X account, X assigns that account a unique user ID ("UID"). A user must also select a password as well as a unique X username (also known as a "handle"). X then appends the @ symbol in front of whatever username the user selects to create the X username (for example: @example). The user may also select a different name (the "display name"), which is not automatically preceded by the @ symbol, to be displayed on his profile picture and at the top of his Tweets alongside his X username. The display name can include symbols similar to emojis. The user can change their password, username, and/or display name at any time, but the UID for the account will remain constant.

38.    While anyone can sign up and use X for free, as of November 2021 Twitter (now X) also offered a subscription model that offered users access to additional features and app customizations. This new subscription was called Twitter Blue, now rebranded "X Premium". A user can sign up for Twitter Blue/X Premium at any time. Twitter Blue/X Premium allows a user to make changes to published tweets, allows users to turn on an "Undo Tweet" feature which keeps a tweet private during a set Tweet Undo period of between 5 and 60 seconds, or until the user taps "Send now," and allows users to Tweet up to 4,000 characters.

39.    At the time of X account creation, X Corp. asks the user for certain identity and contact information, including: (1) name; (2) email address and/or telephone number; and (3) month and year of birth. X Corp. also keeps certain information relating to the creation of each X account, including: (1) the date and time at which the user's account was created; and (2) the method of account creation (e.g., website or X app).

40.    Upon the creation of a X account, a generic profile page is automatically created for the user. This page displays information including (1) the user's X username; (2) the display name; (3) the number of X accounts the user is following; (4) the number of X accounts that are following the user; and (5) Tweets sent by the user (although, as noted above, if the user has chosen to protect their Tweets they will be visible only to preapproved "followers"). The user can personalize this page by posting a personal picture or image (known as an "avatar") to appear on the page and/or a banner image to appear across the top of the profile page. The user can also add text to create a short biography, to identify his location, to provide a link to his website, or to specify his date of birth.

8

41. As noted above, X users can use their account to send and receive communications. If a Tweet includes a X username that is preceded by the @ symbol, that is referred to as a "mention." The X user mentioned in the Tweet will receive a notification informing them that they have been mentioned and showing the content of that Tweet. Similarly, if another X user replies to a Tweet sent by a user, the user who sent the original Tweet will receive a notification that someone replied to their message, and the notification will show the content of that reply.

42. X users can also include links to webpages in their Tweets and Direct Messages. X automatically processes and shortens links provided by the user to a shortened link that starts http://t.co/. X tracks how many times these shortened links are clicked.

43. A registered X user can also "like" a Tweet by clicking a heart icon on a Tweet sent by another user. If another user "likes" a Tweet that is posted by the X user, a notification will appear in the user's account identifying what Tweet was liked and who liked it.

44. As noted above, users can include photographs, images, and videos in their Tweets. Each account has a "media timeline" on their profile that displays "the photos, videos, and GIF's [the accountholder] has uploaded with [their] Tweets." An individual can view a X user's media timeline by visiting the user's X profile page.

45. X users can also opt to Tweet with their location attached. This functionality is turned off by default, so X users must opt-in to utilize it. However, if a X user enables X to access their precise location information, the X user will have the option of attaching their location (e.g., the name of a city or neighborhood) to a Tweet at the time it is sent. If the user uses X's in-app camera to attach a photo or video to the Tweet while the functionality is enabled, the Tweet will include both the location label (e.g., the name of a city or neighborhood) of the user's choice as well as the device's precise location in the form of latitude-longitude coordinates. The user can turn this functionality off (thereby removing their location from their Tweets) at any time, and they can delete their past location data from Tweets that have already been sent.

46. A X user may choose to "follow" another X user. If a X account is unprotected (i.e., privacy settings have not been enabled), the user can follow another user simply by clicking the "follow" button on the other user's X profile page. If a X account is protected (i.e., privacy settings have been enabled), the user can follow another user by clicking the "follow" button and waiting for the other user to approve their request. Once an account is followed by a X user, the Tweets posted by the account the user follows will appear in the user's X Home timeline. Every time a X user follows another account, X sends a notification to the account being followed to inform them about the new follower. Each user's X profile page includes a list of the people who are following that user and a list of people whom that user follows. X users can "unfollow" other users whom they previously followed at any time. X also provides users with a list of "Who to Follow," which includes a few recommendations of X accounts that the user may find interesting based on the types of accounts that the user is already following and who those people follow.

9

47.    A X user can also "block" other X users. This prevents the blocked account from contacting or following the user or from seeing the user's Tweets. X does not notify the user of a blocked account when another X account blocks them.

48.    A X user can also use X's integrated search function. When a user types a search term into X's search tool, it will return results that include accounts, Tweets, and photos that match that search term. X users using the service via the X mobile app also have the option of saving searches that they have performed. A user can delete such saved searches at any time.

49.    A X user can also join or create "Lists" of other X accounts. These Lists often organize X accounts by group, topic, or interest. Viewing a timeline of a specific List will show you a stream of Tweets made only by accounts that are on that List. Users can pin their favorite lists to their X Home timeline page. X users have the ability to remove their accounts from Lists upon which it may appear.

50.    X also offers a functionality called "Spaces," which it calls "a new way to have audio conversations on X." Any user can create a Space; that user is referred to as the "host." Spaces are public, so anyone can join and listen to the conversation within a Space once it is created, although a user can send another X user a link to their Space and invite them to join. By default, the only individuals permitted to speak in a Space are the individuals that the host invites to do so, although this setting can be modified to allow a broader set of individuals to speak. Up to 13 people can speak in a Space at a given time.

51.    X also offers the ability to sign into third-party apps and websites using one's X account. Typically, the third-party app or website will have a link that enables the user to sign into the third-party service using their X account. Doing so grants the third-party service access to the X user's account. Depending on the authorizations the X user gives to the third-party service, the third-party service may be able to read the user's Tweets, see who the user follows on X, post Tweets to the user's profile, or access the user's email address. A user can revoke a third-party app or website's authorization to access their X account and associated data at any time.

52.    X Corp. collects and retains information about a user's use of the X service, to include: (1) content of and metadata relating to Tweets and Direct Messages; (2) photos, images, and videos that are shared via X and stored in the user's Media Timeline; (3) the identity of the accounts that a user follows and the accounts that follow the user's account; (4) the content uploaded to a user's profile page, including their avatar, banner image, and bio; (5) information about Tweets the account has liked; (6) information about Lists associated with the account; (7) information about the Spaces that a user has participated in, including the host of the Space, its start and end times, and information about other attendees; and (8) applications that are connected to the X account. X Corp. also collects and retains various other data about a user and his/her activity, including:

        a.   logs of Internet Protocol ("IP") addresses used to login to X and the timestamp associated with such logins;

   b. transactional records reflecting, for example, when a user changed their display name or email address;
   c. the identities of accounts that are blocked or muted by the user; and
   d. information relating to mobile devices and/or web browsers used to access the account, including a X-generated identifier called a UUID that is unique to a given device.
   e. Additionally, providers of electronic communications services and remote computing services often collect and retain user-agent information from their users. A user agent string identifies, among other things, the browser being used, its version number, and details about the computer system used, such as operating system and version. Using this information, the web server can provide content that is tailored to the computer user's browser and operating system.

53. In my training and experience, evidence of who was using a X account and from where, and evidence related to criminal activity of the kind described above, may be found in the files and records described above. This evidence may establish the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or, alternatively, to exclude the innocent from further suspicion.

54. Based on my training and experience, direct messages, photos, videos, and documents are often created and used in furtherance of criminal activity, including to communicate and facilitate the offenses under investigation. Thus, stored communications and files connected to a X account may provide direct evidence of the offenses under investigation and can also lead to the identification of co-conspirators and instrumentalities of the crimes under investigation.

55. In addition, the user's account activity, logs, stored electronic communications, and other data retained by X Corp. can indicate who has used or controlled the account. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, subscriber information, messaging logs, documents, and photos and videos (and the data associated with the foregoing, such as geolocation, date and time) may be evidence of who used or controlled the account at a relevant time. Similarly, device identifiers and IP addresses can help to identify which computers or other devices were used to access the account. Such information also allows investigators to understand the geographic and chronological context of access, use, and events relating to the crime under investigation.

56. Account activity may also provide relevant insight into the account owner's state of mind as it relates to the offenses under investigation. For example, information on the account may indicate the owner's motive and intent to commit a crime (e.g., information indicating a plan to commit a crime), or consciousness of guilt (e.g., deleting account information in an effort to conceal evidence from law enforcement).

57. Other information connected to the use of an account may lead to the discovery of additional evidence. For example, accounts are often assigned or associated with additional

11

identifiers such as account numbers, advertising IDs, cookies, and third-party platform subscriber identities. This information may help establish attribution, identify and link criminal activity across platforms, and reveal additional sources of evidence.

58.    Therefore, X Corp.'s servers are likely to contain stored electronic communications and information concerning subscribers and their use of Twitter. In my training and experience, such information may constitute evidence of the crimes under investigation including information that can be used to identify the account's user or users.

## CHARACTERISTICS OF COLLECTORS OF CHILD PORNOGRAPHY

59.    In my experience and training, and through my discussions with law enforcement officers who specialize in the investigation of child pornography, and of subjects who use the Internet to gain access to child pornography, I have learned that individuals who use such technology are often child pornography collectors who download images and videos of child pornography. Moreover, I have learned that many subjects have saved numerous images to their hard drive, thumb drive, disks or CDs, and have kept that material for long periods of time. Based upon my knowledge, experience, and training in child pornography investigations, and the training and experience of other law enforcement officers with whom I have had discussions, there are certain characteristics common to individuals involved in the receipt and collection of child pornography:

  a. Child pornography collectors may receive sexual gratification, stimulation, and satisfaction from contact with children; or from fantasies they may have viewing children engaged in sexual activity or in sexually suggestive poses, such as in person, in photographs, in other visual media or from literature describing such activity.

  b. Collectors of child pornography may collect sexually explicit or suggestive materials, in a variety of media, including photographs, magazines, motion pictures, videotapes, books, slides, drawings, or other visual media. Child pornography collectors oftentimes use these materials for their own sexual arousal and gratification. Further, they may use these materials to lower the inhibitions of children they are attempting to seduce, to arouse the selected child partner, or to demonstrate the desired sexual acts.

  c. Collectors of child pornography almost always possess and maintain their "hard copies" of child pornographic material, that is, their pictures, films, videotapes, magazines, negatives, photographs, correspondence, mailing lists, books, tape recordings, etc., in the privacy and security of their home or some other secure location. Child pornography collectors typically retain pictures, films, photographs, negatives, magazines, correspondence, books, tape recordings, mailing lists, child erotica, and videotapes for many years.

12

d. Likewise, collectors of child pornography often maintain their collections that are in a digital or electronic format in a safe, secure and private environment, such as a computer and surrounding area. These collections are often maintained for several years and are kept close by, usually at the collector's residence, to enable the collector to view the collection, which is valued highly.

e. Child pornography collectors also may correspond with and/or meet others to share information and materials; rarely destroy correspondence from other child pornography distributors/collectors; conceal such correspondence as they do their sexually explicit material; and often maintain lists of names, addresses, and telephone numbers of individuals with whom they have been in contact and who share the same interests in child pornography.

f. Collectors of child pornography prefer not to be without their child pornography for any prolonged time period. This behavior has been documented by law enforcement officers involved in the investigation of child pornography throughout the world.

**PROBABLE CAUSE TO SEARCH**

60. On June 20, 2024, two complainants submitted a complaint to the FBI National Threat Operations Center (NTOC) reporting their sister/granddaughter, JANE DOE 1, ran away with KEMP JERMAINE NELSON, DOB: 3/31/2008, on January 19, 2024, and was producing child pornography with NELSON in Newport News, Virginia. The complainants reported NELSON and JANE DOE 1 were at an address in Newport News, Virginia.

61. On June 21, 2024, COOPERATING WITNESS 1 informed FBI Agents NELSON knew JANE DOE 1 because JANE DOE 1 was having sexual relations with a minor known to NELSON. COOPERATING WITNESS 1 saw a video depicting NELSON and JANE DOE 1 having sexual intercourse posted on NELSON's X (formerly known as Twitter) account – username "**@GOHAMTAZ29**", the **SUBJECT ACCOUNT**. COOPERATING WITNESS 1 reported the video to X because COOPERATING WITNESS 1 knew JANE DOE 1 was a minor. COOPERATING WITNESS 1 believed the video was filmed inside of a known bathroom in Newport News, Virginia and depicted NELSON's face. The video did not depict JANE DOE 1's face as NELSON was positioned behind JANE DOE 1 while having sexual intercourse. At the conclusion of the interview, COOPERATING WITNESS 1 turned over a "Cloud Mobile" black cell phone to FBI Agents believed to belong to JANE DOE 1.

62. On June 23, 2024, NELSON contacted FBI Special Agent (SA) Jason Holsinger via telephone. NELSON identified himself and explained he was trying to help and make sure JANE DOE 1 was safe. NELSON stated JANE DOE 1 was at a residence located at 521 Spruce Street. SA Holsinger knew the address to be in Beverly, New Jersey through a cooperating witness.

13

SA Holsinger asked NELSON why he was in New Jersey with JANE DOE 1. NELSON stated "We came to…when I was…dating her, or with her, not dating her, with her, she told me she was homeless and I was trying to make sure she was ok and she was good…" SA Holsinger asked NELSON about the video he posted online depicting him having sexual intercourse with JANE DOE 1. NELSON claimed he believed JANE DOE 1 was an adult and that he was a "content creator" and did that with all his "females." NELSON claimed he only creates videos with his "girlfriends", not with minors. NELSON claimed he thought JANE DOE 1 was 19 years old. When asked if NELSON had other videos of JANE DOE 1, NELSON stated "my black phone". SA Holsinger advised NELSON to not destroy the device, but NELSON claimed he no longer had that device. SA Holsinger asked NELSON if the device contained videos of NELSON and JANE DOE 1 having sexual intercourse. NELSON stated "well, it's not no sexual intercourse, I don't record videos like that…". NELSON then stated it was like a "clip real quick." NELSON was not sure if there were small clips of NELSON and JANE DOE 1 having sexual intercourse on his black phone. NELSON was asked if there were any additional pictures or videos posted to other social media accounts. NELSON stated, "I been deleted the one from Twitter."

63.    In the same conversation on June 23, 2024, SA Holsinger asked where JANE DOE 1 was located. NELSON confirmed he was just with JANE DOE 1 but went for a walk. NELSON was concerned if he needed to be present when the police came to pick up JANE DOE 1. NELSON informed SA Holsinger JANE DOE 1 was going to stay at the residence located at 521 Spruce Street, Beverly, New Jersey.

64.    On June 23, 2024, the Beverly Police Department safely located JANE DOE 1 at 521 Spruce Street, Beverly, New Jersey and returned JANE DOE 1 to her family.

## INFORMATION TO BE SEARCHED AND THINGS TO BE SEIZED

65.    I anticipate executing this warrant under the Electronic Communications Privacy Act, in particular 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A), by using the warrant to require X Corp. to disclose to the government copies of the records and other information (including the content of communications) particularly described in Section I of Attachment B. Upon receipt of the information described in Section I of Attachment B, government authorized persons will review that information to locate the items described in Section II of Attachment B.

## CONCLUSION

66.    Based on the aforementioned factual information, your Affiant respectfully submits that there is probable cause to believe that the X account registered to the following identifier: "@GOHAMTAZ29", the SUBJECT ACCOUNT, contains evidence relating to violation of 18 U.S.C. § 2251(a) regarding the production of child pornography. And that the following property, evidence, fruits and instrumentalities of these offenses are located within the SUBJECT ACCOUNT registered to the following identifier, "@GOHAMTAZ29"; and stored on computers maintained by X Corp.

67.    I further submit that probable cause exists to believe that evidence, fruits, and instrumentalities of such violations will be found within the information associated with the **SUBJECT ACCOUNT** (more particularly described in Attachment A) for evidence of activities relating to material involving the sexual exploitation of minors, in violation of 18 U.S.C. § 2251(a). Accordingly, I request that a warrant be issued authorizing FBI agents, with assistance from other law enforcement personnel, to search the accounts, obtain the information in the accounts and to seize all contents referred to in and to seize all contents referred to in Attachment B.

68.    Your Affiant, therefore, respectfully requests that the attached warrant be issued authorizing the search of the X **SUBJECT ACCOUNT** registered to the following identifier: "**@GOHAMTAZ29**" that is stored at premises owned, maintained, controlled, or operated by X Corp., an electronic communications service and/or remote computing service provider headquartered at 1355 Market Street, Suite 900, San Francisco, CA 94103. Authorizing the search and seizure of the items described in Attachment B.

69.    Pursuant to 18 U.S.C. § 2705(b), I respectfully request that the Court enter an order commanding X Corp. not to notify any other person, including the subscriber of the specified account, of the existence of the warrants, this affidavit, the applications, any returns and associated paperwork, because there is reason to believe that any such notification will result in: (1) destruction of or tampering with evidence; (2) intimidation of potential witnesses, including but not limited to minor victims; or (3) otherwise seriously jeopardize the ongoing investigation by, for example, causing others with knowledge of the subject's activities to flee, or to mask their identity and activity thereby jeopardizing the ongoing investigation. Premature disclosure of the contents of this affidavit and related documents may compromise this ongoing investigation.

15

70.   Notwithstanding 18 U.S.C. § 2252/2252A or any similar statute or code, X Corp. shall disclose responsive data by sending it to 11827 Canon Blvd., Suite 300, Newport News, Virginia, 23606, or via email to demaldonado@fbi.gov.


_____

Desirae Maldonado
Special Agent
FBI Child Exploitation Task Force
Federal Bureau of Investigation


This affidavit has been reviewed for legal sufficiency by Assistant United States Attorney Peter Osyf.

Reviewed:   _____

Peter Osyf
Assistant United States Attorney


Subscribed and sworn to before me this **20th** day of August 2024, in the City of Norfolk, Virginia.

_____

The Honorable Douglas E. Miller
UNITED STATES MAGISTRATE JUDGE

16